CAROLINE A. CHICKERING *vs.* GLOBE MUTUAL LIFE INSURANCE COMPANY.

Suffolk.   March 18. — September 7, 1874.   November 25. — 27, 1874.   .
COLT & ENDICOTT, JJ., absent.

A policy issued by an insurance company on the life of A. contained a provision that if the premiums should not be paid on or before the days when due, at the office of the company, or to agents when they produce receipts signed by an officer of the company, the policy should cease. On the issue whether a premium due on a certain day had been paid to an agent of the company, there was evidence that the agent was authorized to collect premiums, and after deducting his commissions to invest the remainder in certified checks which were to be sent with his account to the company at regular periods; that a few days before the premium became due the agent was indebted to the firm of which A. was a member, to an amount exceeding the premium; that it was the practice of the members of the firm to pay their private debts with funds of the firm, and A.'s premiums had previously been so paid; that the agent stated to A. that he would take care of the premium, and after the day when it became due stated to him that he had done so; that the agent had received the receipt signed by an officer of the company, and had so informed A., but retained it as a voucher against A.; that the agent sent the company, after the death of A., a check for an amount including this premium with his account; but the company refused to receive it, and returned him a check for the amount of the premium, and demanded the receipt. *Held,* that the evidence was sufficient to warrant the jury in finding that funds, which the assured had a right to control and apply to the payment of the premium, had come into the hands of the company's agent before the premium became due; that the assured directed that the agent should apply so much of said funds as was necessary to that payment; and that the agent did so apply it, and that the jury would be warranted in finding a verdict for the plaintiff.

. CONTRACT on a policy of insurance for $20,000, dated February 12, 1870, upon the life of Thomas E. Chickering, payable to the plaintiff, his wife. By the terms of the policy the sum of $329.60 was to be paid on or before the 9th days of February, May, August and November, in every year during the continuance of the

policy. Among the conditions forming a part of the policy were the following:

" 3d. If the said premiums shall not be paid on or before the days mentioned for the payment thereof, at the office of the company, in the city of New York, (unless otherwise expressly agreed in writing,) or to agents when they produce receipts signed by the president, vice-president or secretary, then, in every such case, the said company shall not be liable for the sum assured, or any part thereof, and this policy shall cease and determine."

" 9th. Agents of the company are not authorized to make, alter or discharge contracts, or waive forfeitures."

Trial before *Wells*, J., who reserved the case for the consideration of the full court upon a report in substance as follows:

Thomas E. Chickering died on February 14, 1871. The answer set up in defence the non-payment of the premium which became due on the 9th of that month. It was admitted that the premium was not paid, unless in the manner shown in the following evidence:

The plaintiff put in the deposition of Edward H. Osborne, a copy of which was made part of the report. He testified, in substance, as follows: " I was agent of the defendant company from February 1, 1870, to December 31, 1872, and had the sole management of the business in Boston. I had previously been the agent of Chickering & Sons, and after I became an agent of the defendants I bought pianos from time to time for my friends, from Chickering & Sons, and rendered accounts to the firm of such purchases. I stated to Thomas E. Chickering that I should take care of his premium, and I did so, the payment prior to his death. I saw him on several occasions prior to the premium becoming due, and subsequently, and told him that his premium was cared for. I made such a statement to him before the premium of February 9, 1871, became due. I should say the same week. At that time I had received the signed receipt for the premium from the company; but it was not good until countersigned by myself. I communicated the fact to Thomas E. Chickering that I had received the receipt from the company in the usual form of a notice. I had several conversations with him about it. He remarked to me that his premium was due. I said, ' Yes, sir, but your premium is taken care of.' This was the sub-

stance of subsequent conversations. It was a matter of conversation from time to time. I had charge of his life policies, and I had been his adviser from time to time, and told him that he could depend upon me to take care of his premiums. Before February 9, 1871, he said to me, ' My premium is due on the 9th.' I said, ' Yes; but you need give yourself no uneasiness about it, as I'll take care of it for you.' At that time I was indebted to the firm of which he was a member, on my running account. I do not remember to what extent the balance was against me; it was for more than the amount of the premium. I had a conversation with Thomas E. Chickering as to this balance due, in connection with the payment of the premium; and I said to him that I would come in at my leisure, and we would have a settlement of our affairs. I saw him the week he died, on several occasions. I saw him on Saturday night prior to the Tuesday morning on which he died. He died at one o'clock A. M. This was the last time I saw him, He then spoke of his premium, and asked me if it was all right. I said, ' You know that I have always told you that I would take care of your premium.' I took supper with him and his family that evening at the Tremont House.

"On February 15, 1871, being in New York, I made and signed the following statement, in writing, at the request of the company: ' New York, February 15, 1871. To the officers of the Globe Mutual Life Insurance Company. I have to report to you the death of Colonel Chickering, insured under policy No. 18788. The premium became due on the 9th instant; but finding it more convenient for him to pay the premium the first of the coming week, I told him I would take care of it for him, though I did not deliver the receipt to him. The premium would have been included in my report of this date (15th) as I deemed the premium paid and myself entirely responsible therefor. Colonel Chickering died Monday night, of supposed apoplexy.'

"While in New York, I saw the second vice-president, John A. Hardenbergh, and the president of the company, Pliny Freeman. I saw them on February 15. I had a conversation in regard to Colonel Chickering's death with John A. Hardenbergh; it is embodied in a letter to the company. This letter was written on the spot, and handed to the company. The officers desired

me to embody my statement in writing, and I did so. There was other conversation with Hardenbergh. He said there was one question he would like to ask me: Had you seen, instead of the notice of the death of Colonel Chickering, that he had surreptitiously left the country, would you deem yourself responsible for the premium? I told him that I should. He asked me why. I told him because I had promised him I should pay it. I told him I hoped he understood the matter fully, and that I should insist upon sending the premium to the company. He remarked to me that he could see no objection to my doing so. I then said to him, that ' By virtue of my contract with the company my report should have been sent to them that day, but of course being in New York it would have to be delayed one day.' He said that was all right. The president was in the room, in and out of the room. Mr. Hardenbergh's and Mr. Freeman's desks were in the same room. Whether he was cognizant of conversation, I don't know. John A. Hardenbergh was then the active manager, and was the one who dealt chiefly with me. The company was supposed to be managed by a board of trustees. I did not give up the receipt to Thomas E. Chickering, because that was my voucher in settlement with his estate, that I had paid so much on his account. I made a return to the company on February 16 or 17, 1871, and it included this premium. On February 22, I received a demand from the company for the receipt, and I sent it to the company, and received from it a check for the amount of the premium."

*Cross-examined.* " I did not say, in my statement to the company of February 15, that Chickering said he found it more convenient to pay the premium on the first of the coming month. I said, ' I finding it,' not Colonel Chickering finding it. I found it out, because my connection with the Chickering company had been such that I knew that at the last of the week they had a great deal of money to pay. I told him not only at that time, but on several occasions, that I would take care of it, without any request of his. It was understood that I would. I did not countersign the renewal receipt, or credit Colonel Chickering with any payment for February of 1871, or before February, or do anything respecting the payment due at that date, except to say to him that I would take care of it. It was not my habit to countersign any receipts

until they were delivered. I had no agreement with Colonel Chickering to pay this premium and charge it in my account with Chickering & Sons. It was the general understanding between us. It was not any more than what was embodied in different conversations we had had together at different times. There never was any conversation in which it was agreed that it should be charged in the account with Chickering & Sons. My understanding was, that any charge I had against Colonel Chickering should be set off against any charge Chickering & Sons should have against me, and I presumed that this was Colonel Chickering's understanding. I have not settled the account between me and Chickering & Sons then due, because I've had no occasion to settle the suit. I have a receipt for moneys I paid for the Colonel previously, and no demand has been made on me, nor have I demanded a settlement from the Chickerings. I do not know how the account stands."

By the contract of this witness with the defendant, appointing him its agent, he agreed to devote his exclusive time in the work of soliciting applications, collecting premiums, and delivering policies. The contract contained the following clauses: " That he will make a correct statement on the first and fifteenth of each and every month, of all the moneys received by him or his agents, and after deducting his commissions as above mentioned, he will accompany said statement with a remittance in certified check or draft upon New York for all balances due to said company, and will as agent comply with all the rules and regulations of said company, a violation of any of which this agreement shall be null and void, at the option of the company." " The authority f said agent shall extend no further than is above stated. He hall not make, alter nor discharge any contract, nor waive forfeitures, nor receive any moneys due or to become due to said company, except on receipt signed by some officer of the company, or other written authority from some officer of the company; and shall receive no further remuneration for any service than is above stated."

The plaintiff also introduced the testimony of Charles F. Chickering, who testified that he was a brother of the deceased, and that they had been members of the firm of Chickering & Sons; that none of the partners of the firm kept private bank accounts;

that their private bills were paid by the cashier of the firm by checks signed by the firm; that debts due the firm were offset against private debts due from the partners. He also testified that he found the policy declared on immediately after his brother's decease; that he went to see Osborn early the week following, and demanded a blank for proof of loss; that Osborn said he would send on and have one the next morning; that he did not receive one from Osborn, and at his request called on the president of the company in New York; that the president told him that this was a peculiar case, and must go before the board, and that he must make his application to Osborn; that this call on the president was about four weeks after his brother's death; that he should have made a demand sooner, if Osborn had not promised to furnish blank form for proof. He also testified that he asked Osborn why he did not give his brother the receipt for the payment of the premium, and he replied that he held it as a voucher against his brother.

Joseph E. Clapp testified in behalf of the plaintiff that he had been for fifteen years a book-keeper of Chickering & Sons; that he had paid the previous premiums on this policy with the checks of Chickering & Sons; that he was accustomed to pay private debts of partners by checks of firm. He also testified that he knew Osborn; that Osborn came into the office sometime previous to February 9, 1871, and said he had some money for the firm, thirty dollars over and above the amount of said Chickering's life insurance premium. At the time of the death of Thomas E. Chickering, Osborn owed the firm about seven hundred and fifty dollars. The witness also produced the account of Osborn on the books of the firm, from which it appeared that Osborn paid five hundred dollars November 23, 1870, and one hundred and fifty dollars February 6, 1871.

Dr. John H. Wilcox testified that he met Osborn at a supper at Thomas E. Chickering's on the Saturday night before he died; that he overheard Osborn say to Chickering that the matter of the life insurance was all right, all correct; that this was said in answer to a question by Chickering.

The defendant and the plaintiff, by agreement, reserved the right to object to the competency of any of the evidence. After the plaintiff's evidence was all in, the defendant asked the judge to instruct the jury as follows:

" 1. That the evidence offered and produced by plaintiff, so far as legally admissible, in relation to the conversations and transactions between the witness Osborn and Thomas E. Chickering, does not in law, if taken to be true, establish a payment to the defendant of the premium due on the policy February 9, 1871, pursuant to the terms and conditions thereof.

" 2. That the evidence of the plaintiff, so far as legally admissible, does not in law show or establish a waiver by the defendant of the non-performance in regard to the payment of said premium at the time and in the manner required by the policy, nor a waiver of the forfeiture which resulted from such non-performance.

" 3. That the plaintiff's evidence, so far as legally admissible, does not by law prove or establish a ratification by the defendant of the alleged arrangement or agreement by which the witness Osborn agreed with Thomas E. Chickering to take care of or pay said premium.

" 4. That upon all the evidence offered by the plaintiff she is not in law entitled to recover in this action."

The judge decided that the second and third prayers for instructions were correct and should be given to the jury; and thereupon, by agreement and consent of parties, the case was taken from the jury and reserved for the consideration of the full court, with the agreement, that if upon so much of the evidence introduced as is competent and admissible, the jury would be warranted in finding a verdict for the plaintiff, judgment is to be entered for the plaintiff for the amount of the policy and interest from May 15, 1871; otherwise judgment is to be entered for the defendant. If, however, the court shall determine that the ruling of the presiding judge as to the second and third prayers was erroneous, the case is to be submitted on these points to a jury.

The case was argued in March, 1874, by *H. W. Paine & R. D. Smith*, for the plaintiff, and *S. Bartlett & W. A. Munroe*, for the defendants; and judgment afterwards ordered for the plaintiff. The defendants thereupon moved for a rehearing, and this motion was argued in November, 1874.

*R. D. Smith*, for the plaintiff, cited *Hoyt* v. *Mutual Benefit Insurance Co.* 98 Mass. 539; *Bridges* v. *Garrett*, L. R. 4 C. P. 580; *S. C.* L. R. 5 C. P. 451; *Catterall* v. *Hindle*, L. R. 1 C. P. 186; *S. C.* L. R. 2 C. P. 368; *Sweeting* v. *Pearce*, 9 C. B. N. S. 534; *Butterworth* v. *Cotesworth*, cited 9 C. B. N. S. 538.

*S. Bartlett & G. O. Shattuck*, for the defendants. 1. In the absence of usage or express contract, an agent cannot receive payment of a debt due his principal by offsetting his private debt. *Russell* v. *Bangley*, 4 B. & Ald. 395. *Todd* v. *Reid*, Ib. 210. *Bartlett* v. *Pentland*, 10 B. & C. 760. *Scott* v. *Irving*, 1 B. & Ad. 605. *Barker* v. *Greenwood*, 2 Y. & C. Exch. 414. *Stewart* v. *Aberdein*, 4 M. & W. 211. *Young* v. *White*, 7 Beav. 506. *Leverson* v. *Lane*, 13 C. B. N. S. 278. *Piercy* v. *Fynney*, L. R. 12 Eq. 69.

2. The instrument creating the agency in this case guardedly provides against the collections becoming the money of the agent, and against any use of them by way of set-off or otherwise; and inasmuch as Thomas E. Chickering knew that the sum set off was the defendants' property, he was put upon inquiry as to the authority of the agent, the result of which inquiry, if made, would have negatived the authority, and if not made, he is affected by all the consequences which would have resulted from such inquiry.

3. There is no pretence that there was any evidence in the nature of the agency, or of any custom or usage, or of any transaction under the agency, from which the assent of the principal to the set-off could be inferred.

AMES, J. The question raised by this report is whether there was any evidence upon which the jury would have a right to find that the premium due from the assured on the ninth day of February, 1871, was paid according to the terms of the policy. Even upon the assumption that Osborn, as the defendants' agent, had no authority to waive or modify those terms in any respect, a seasonable payment to him was all that it was necessary for the plaintiff to prove. He was the agent of the corporation, not merely for this special transaction, but generally, for the collection of all premiums that became due to them within a certain territory; and whatever money came to his hands in this way he was undoubtedly to hold in trust, as a distinct fund; but he held it as an accounting agent, and not as a clerk or messenger of the defendants. The mode of accounting, as pointed out in the contract by which he was appointed, was not by forwarding the specific and identical money which he from time to time received in that capacity; but after reserving out of it the commission which was to be the compensation for his services, by investing the re-

mainder at regular and prescribed periods, in certified checks or drafts payable in the city of New York, and remitted to the defendants with his account.

It appears from the report that he charged himself, in his return to the defendants, with the premium in question, and included it in the certified check with which, according to his regular practice, he had undertaken to pay the balance apparently due to them. The amount of the premium, therefore, actually came into their hands in regular course of business; but on the ground that it was not seasonably paid to their agent they have repaid it to him, and now insist that it was not paid by the assured in conformity to the terms of the policy.

The evidence reported had a tendency to show that a few days before the premium became payable, Osborn had funds in his hands, belonging to the firm of Chickering & Sons, to an amount largely exceeding the premium. He had been the agent of that firm for the sale of pianos, and in that capacity had made sales, and collected the proceeds of these sales. Whatever money he had collected in that way came to his hands as their agent, and he held it in trust for them. The funds in his hands were substantially their funds, and they had a right to direct to what uses they should be applied.

No question is raised by the defendants as to the right of the assured to pay his own personal debt from the funds of the firm. It appears that such a proceeding was in accordance with the ordinary practice of the partners, and that it had been the habit of the assured to pay the premiums on this policy, as they became due, in that very manner.

It is not contended that the fact, that the premium had become due, was forgotten by the assured, or that the necessity of prompt and punctual payment was overlooked. It is clear on the evidence that an arrangement of some sort was proposed and discussed for the purpose of meeting that necessity, and the jury might have found from the evidence that Chickering not only relied upon that arrangement, but had every assurance that it had been carried into effect. If there were funds actually in the hands of Osborn belonging to the firm, and which he was ready at any moment to pay to the assured, and which the assured had an absolute right to control, that control might as well be exercised

by an oral direction to Osborn to apply a portion of the funds to the payment of this premium, as in any other way. If, in addition to such oral direction, there was an express promise by Osborn that he would pay the premium, and after that an express assurance that he had done so, the assured might not unreasonably suppose that he had done all that was required.

It is objected that the effect of such an arrangement would be to render Osborn a debtor to the corporation without their consent; but it is difficult to see how it could have any effect in that respect, to distinguish it from a payment in any other mode. If it were an actual placing of money in the hands of their agent, it would add to the fund which he held in trust for the defendants, and would not make him their debtor in any other capacity or mode.

There was evidence, also, as to a declaration of Osborn, at about that time, that money had come into his possession exceeding the premium by thirty dollars — a declaration having a tendency to show a specific application of the money by him to that precise purpose. And there was also evidence, not contradicted, that the customary receipt, as a voucher of the payment, had come to his hands in the regular course of business; and although it had not been delivered by him to the assured, that fact was explained by his testimony that he retained it only as a voucher for his own account with the firm.

It is manifest also that in rendering his account to the defendants, he included this premium in the balance which he undertook to pay by the "certified check or draft, payable in New York," required by his contract with them; and although this was not done with literal punctuality as to time, whatever delay occurred was consented to by the defendants.

The evidence was sufficient to warrant the jury in finding that funds which the assured had a right to control, and apply to the payment of the premium, had come into the hands of the defendants' agent before the premium became due; that the assured directed that the agent should apply so much of said funds as was necessary to that payment, and that the agent did so apply it. Such facts would show a payment of the premium, within the meaning of the policy.

According to the terms of the report, therefore, there must be

*Judgment for the plaintiff.*